IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARRYL JULIUS POLO,<br>        a/k/a djppimp,<br><br>          *Defendant*. | No. 1:19-CR-253-2<br><br>The Honorable T.S. Ellis, III<br><br>Sentencing Date:  May 7, 2021 |

### **POSITION OF THE UNITED STATES ON SENTENCING**

The United States hereby submits its position on the sentencing of the defendant Darryl Julius Polo a/k/a djppimp in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the U.S. Sentencing Guidelines, 18 U.S.C. § 3553(a), and the policy of this Court.

The defendant helped build and run two of the biggest illegal streaming operations in the United States, both of which had more content than any competing licensed streaming service.

First, the defendant ran a site called iStreamItAll ("ISIA"), an online, subscription-based service headquartered in Las Vegas, Nevada that permitted users to stream and download copyrighted television programs and movies without the permission of the relevant copyright owners.  *See* Polo Statement of Facts ("SOF"), Dkt. 133, at ¶ 1.  According to the defendant, ISIA made available to its subscribers more than 118,479 different television works and 10,980 individual movies, which he stated "was more content than that offered by Netflix, Hulu, Vudu, Amazon Prime, and other licensed streaming services."  *Id.* at ¶ 5.  In fact, the defendant sent out emails to potential subscribers highlighting ISIA's huge catalog of works and urging them to cancel Netflix, Hulu, and similar services, and subscribe to ISIA instead.  *Id.*  The defendant admitted that he made over $1 million from ISIA and his other piracy services, and that he used the

1

profits from ISIA to further its illegal operation and in doing so he engaged in money laundering. *Id.* at ¶¶ 14-15.

Second, before the defendant devoted himself to ISIA, he worked as a computer programmer at Jetflicks, another online, subscription-based service headquartered in Las Vegas that permitted users to stream and, at times, download copyrighted television programs without the permission of the relevant copyright owners. *Id.* at ¶¶ 22-38. Like ISIA, Jetflicks had a huge inventory of television shows; as of April 24, 2017, Jetflicks claimed to have 183,285 television episodes. *See* Exh. A. The defendant worked at Jetflicks from May 2012 to September 2013 and then again from December 2015 to July 2016. *Id.* at ¶¶ 31 and 36. At Jetflicks, he conspired with co-defendants Kristopher Dallmann, Douglas Courson, Felipe Garcia, and Peter Huber to obtain television episodes from pirate sites, process them, and make them available to subscribers for payment. *Id.* at ¶¶ 30-37. Besides configuring software for and writing computer scripts to obtain illegal content for Jetflicks, he helped develop the Jetflicks Android smartphone application ("app"). *Id.* at ¶ 31. Both ISIA and Jetflicks were accessible from various devices and platforms, including computer operating systems, smartphones, tablets, smart televisions, video game consoles, digital media players, set-top boxes, and web browsers. *Id.* at ¶ 1.

On December 12, 2019, as part of a plea agreement, the defendant pleaded guilty to five counts of the indictment, specifically, Count One, conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371; Count Six, criminal copyright infringement by distributing a copyrighted work being prepared for commercial distribution, in violation of 17 U.S.C. § 506(a)(1)(C) and 18 U.S.C. §§ 2319(d)(2) and 2; Count Eight, misdemeanor criminal copyright infringement by reproduction or distribution in violation of 17 U.S.C. §§ 506(a)(1)(A) and 106(1) and (3) and 18 U.S.C. §§ 2319(b)(3) and 2; Count Eleven, misdemeanor criminal copyright infringement by public performance, in violation of 17 U.S.C. 506(a)(1)(A) and 106(4)

and 18, U.S.C. §§ 2319(b)(3) and 2; and Count Sixteen, money laundering in violation of Title 18, U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i) and 2.  *See* Polo Plea Agreement, Dkt. 132.

In the Presentence Investigation Report ("PSR"), the probation officer assigned to this case determined that, for these five counts, the defendant has an offense total of 25, a criminal history category of II, and a Guidelines range of 63 to 78 months of prison.  PSR, at ¶ 126-27.  As explained below—after a careful review of the PSR, plea agreement, and U.S. Sentencing Guidelines—the government partly disagrees with this calculation.  Rather, the government believes that the defendant has an offense total of 23, a criminal history category of II, and a Guidelines range of 46-57 months.

Furthermore, the government believes that this is the exceptional case where the Court should sentence the defendant at the top end of the Guidelines range.  For one thing, after the defendant pleaded guilty, new evidence emerged to provide a better estimate of the scope of the defendant's actions and the damage he caused.  For example, the government now believes that the total estimated infringement amount for ISIA is over $40 million and the infringement amount for the two periods that the defendant worked at Jetflicks is an estimated $8 million, for a total of $48 million.[1]  PSR, at ¶ 23.  If the Court were sentencing the defendant based on this full infringement

---

[1] The Court may make a reasonable estimate of the infringed amount using any relevant information.  *See* U.S.S.G. § 2B5.3 appl. nt. 2(E).  Where an infringing item is a digital or electronic reproduction of the infringed item, the court bases the infringement amount on the retail value of the infringed item multiplied by the number of infringing items.  *See* U.S.S.G. § 2B5.3 app. nt. 2; *United States v. Shi Chang Huang*, 491 Fed. Appx. 382, 385 (4th Cir. 2012).

The $40 million estimate is based on ISIA's inventory and estimated streams/downloads of ISIA's inventory by subscribers, as well as the average/typical retail price of a television episode and a movie.  This number does not even include all of the downloads the defendant made to create the ISIA catalog (to obtain a single high-quality television episode or movie, a pirate may need to download numerous works from pirate sites; the quality of illegal works on such sites can vary widely).  Based on a small sample of log files from *istreamitall.com*, the government believes that

amount of $48 million—which is extremely conservative—the defendant's Guideline range would be 135 to 168 months. However, the government will abide by the plea agreement and only request a 12-level increase for the defendant's infringement amount pursuant to Section 2B5.3(b)(1) and 2B1.1(b)(1)(G). Polo Plea Agreement, at ¶ 4.[2]

Accordingly, pursuant to the plea agreement, the PSR, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully recommends that the Court sentence the defendant to 57 months in prison.

## BACKGROUND

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Id.* at 50. The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also

---

the defendant probably downloaded an average of 63 television episodes and six movies a day during his operation of ISIA.

    Similarly, for Jetflicks, the government estimates that the infringement amount is around $37.5 million. This number is based on Jetflicks' inventory, its additional downloads during the period of its operation, and streams/downloads of Jetflicks' catalog, as well as the average/typical retail price of a television episode. Because all of the Jetflicks' conspirators other than Dallmann worked at Jetflicks for only portions of the conspiracy, it makes sense to calculate an infringement amount for each defendant based on the approximate time that defendant participated in the conspiracy. Since Dallmann operated Jetflicks for approximately 3216 days and the defendant worked there approximately 684 days, the infringement amount for the defendant for his work at Jetflicks would be around $8 million.

    [2] The plea agreement provides that "[a]ny stipulation on a Guideline provision does not limit the parties' arguments as to 18 U.S.C. § 3553(a)." Polo Plea Agreement, at ¶ 4.

4

"consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49-50; *see also Clark*, 434 F.3d at 685. Ultimately, the sentence imposed must be "sufficient, but not greater than necessary to comply with the purposes set forth in" § 3553(a). *United States v. Midgett*, 2016 WL 542141, at *1 (E.D. Va. Feb. 9, 2016).

**I.      Guidelines Calculation**

In the plea agreement, the government and defendant agreed that the five counts group under Section 3D1.2(d) of the Guidelines and that under Section 3D1.3(b) the defendant's offense level should be determined under Section 2B5.3 rather than Section 2S1.1.[3] Polo Plea Agreement, Dkt. 132, at ¶ 4. The parties agreed that the defendant's base level is 8 pursuant to Section 2B5.3(a); the infringement amount is more than $250,000, but not greater than $550,000, thus resulting in a 12-level increase pursuant to Sections 2B5.3(b)(1) and 2B1.1(b)(1)(G); the offense involved the display, performance, publication, reproduction, or distribution of a work being prepared for commercial distribution, resulting in a 2-level increase pursuant to Section 2B5.3(b)(2); and the offense involved the manufacture, importation, or uploading of infringing items, resulting in a 2-level increase pursuant to Section 2B5.3(b)(3). *Id.* Thus, the parties agreed to a minimum offense level of 24. The parties did not agree on any further sentencing issues related to the Guidelines.

In the PSR, the probation officer found that the five counts group under Section 3D1.2(c) of the Guidelines and that under Section 3D1.3(a), the defendant's offense level should be determined under Section 2S1.1 rather than Section 2B5.3 because the money laundering count would have the

---

[3] Section 3D1.2(d) applies if the offense level is determined largely on aggregate harm or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior. This subsection specifically references the grouping of counts covered by Sections 2B5.3 and 2S1.1, which include the criminal copyright infringement and money laundering counts to which the defendant pleaded guilty.

highest offense level.[4] PSR, at ¶¶ 76-77. Under Section 2S1.1(a)(1), the base offense level is determined by the offense level of Section 2B5.3.[5] That would include the base offense level and specific offense characteristics to which the parties agreed in the plea agreement, which add up to a minimum adjusted offense level of 24.

In addition, the probation officer found that the defendant was convicted under 18 U.S.C. § 1956, resulting in a 2-level increase pursuant to Section 2S1.1(b)(2)(B), and that the defendant used a specific skill in a manner that significantly facilitated the commission or concealment of the offense, resulting in another 2-level increase pursuant to Section 3B1.3. That would mean an adjusted offense level of 28.

The government agrees that the defendant was convicted under 18 U.S.C. § 1956 and that this specific offense characteristic should count if the Court was proceeding under Section 2S1.2. However, because the government and the defendant agreed in the plea agreement to proceed under Section 2B5.3 of the Guidelines, the government does not argue for that specific offense characteristic here.

The government also agrees with the probation officer that the defendant used a specific skill in a manner that significantly facilitated the commission or concealment of the offense. However, this adjustment would only apply under Section 2B5.3, not Section 2S1.1. As discussed in more detail below, the defendant *did* use his computer programming and coding skills to commit and conceal criminal copyright infringement but did not use any special skills to commit or conceal his money laundering. Pursuant to application note 2(C) to 2S1.1, the special skill adjustment in

---

[4] The probation officer presumably relied on application note 6 to Section 2S1.2, which provides that where a defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped under Section 3D1.2(c). In turn, Section 3D1.2(c) provides that the offense level should be calculated based on the highest offense level of the counts in the group.

[5] The offense level from Section 2B5.3 includes the base offense level, specific offense characteristics, cross references, and special instructions. USSG § 1B1.5(b)(1).

Section 3B1.3 would only apply to money laundering, not criminal copyright infringement. Thus, the adjusted offense level under 2B5.3 would be 26 and the adjusted offense level under 2S1.1 would be 26 as well.

In short, even if the Court calculates the offense level under Section S21.1 (as recommended by the probation officer), there is no prejudice to the defendant given what the government and defendant agreed to in the plea agreement. Assuming that the Court would provide a special skill adjustment for the defendant under Section 2B5.3—which is certainly warranted given the defendant's use of his computer programming and coding skills for copyright infringement—the adjusted offense level would be the same under 2B5.3 as it is under S21.1, namely, 26.

Finally, the parties agreed that the defendant has assisted the government in the investigation of the defendant's own misconduct by timely notifying authorities of his intention to enter a plea of guilty, and the government agrees that the defendant clearly accepted responsibility for his crimes, which results in a one- and then an addition two-level decrease in the offense level pursuant to to Section 3E1.1(b) and (a). As a result, the defendant has a total offense level of 23.

The PSR further notes that the defendant has a criminal history category of II. *Id.* at ¶ 96. Accordingly, the government believes that the defendant has a total offense level of 23 and a Guideline range of 46 to 57 months. *Id.* at ¶ 127. As discussed below, the government believes that a sentence of 57 months, at the high end of this range is appropriate.

## II. The 18 U.S.C. § 3553(a) Factors

18 U.S.C. § 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for law; to provide just punishment for the offense;

7

to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

The probation officer did not identify any factors that would warrant a departure from the applicable sentencing guideline range.  The government agrees.

### A. The Nature And Circumstances Of The Offense

In terms of numbers, online piracy represents one of the biggest crimes in the United States and the world.  *See* https://dataprot.net/statistics/piracy-statistics/ (noting that there were 190 billion visits to pirate sites in 2018, 17.38 billion in the United States alone).  Many people visit pirate sites and stream and download pirated works; they steal intellectual property with no compensation to the copyright owner.  Here, though, the defendant took online piracy to unprecedented levels. Essentially, the defendant created what amounted to an illegal version of Netflix—the most popular legitimate streaming service in the world—but with more content.

The defendant ran this illegal streaming service for over five years.  He registered the domain name *istreamitall.com* in August 2014 and operated ISIA until the government seized the domain in September 2019.  *See* Polo SOF, at ¶ 1.  In his plea agreement, the defendant admitted that ISIA offered its subscribers 118,479 different television episodes and 10,980 individual movies.  *Id.* at § 5.  To join ISIA, users had to choose one of several subscription plans:  a monthly option at $19.99, a quarterly option at $54.99, a semi-annual option at $99.99, and a yearly option at $179.99.  *Id.* at § 10.  In comparison, in 2010, Netflix offered its U.S. subscribers 530 different television shows (each with multiple episodes) and 6755 individual movies, and in 2019, it offered 1859 television shows and 3989 movies.  *See* https://flixable.com/netflix-museum/.  For U.S. subscriptions, in 2010, Netflix charged $7.99 a month, and in 2019, it charged $8.99 a month for basic service, $12.99 a month for standard service, and $15.99 a month for premium service (the more expensive subscription tiers offered better video qualities and allowed shows to be watched

8

simultaneously on more devices).  *See* https://www.fastcompany.com/90341399/netflix-prices-just-went-up-again-heres-every-rate-hike-ever.  In short, ISIA had more content than any other competing legitimate streaming service including Hulu, Vudu, and Amazon Prime, and even charged its subscribers more.  Worse, the defendant sent out emails to potential subscribers highlighting ISIA's huge catalog of works and urging them to cancel those licensed services and subscribe to ISIA instead.  Polo SOF, at ¶ 5.

A legitimate streaming service such as Netflix can spend billions of dollars to license works to show its subscribers.  *See* https://www.statista.com/statistics/707302/netflix-video-content-budget/#:~:text=In%202020%20video%20streaming%20service,at%2017%20billion%20U.S.%20 dollars (noting that Netflix spent $17.3 billion on video content in 2020).  However, the defendant did not spend a penny.  Rather, the defendant obtained infringing television programs and movies from pirate sites around the world—including some of the globe's biggest torrent and Usenet NZB sites specializing in infringing content such as The Pirate Bay, RARBG, TorrentDay, NZBplanet, NZBgeek, and NZB Finder—using various automated computer scripts that ran 24 hours a day, seven days a week.  Polo SOF, at  ¶ 7.  Specifically, the defendant used sophisticated computer programming to scour global pirate sites for new illegal content; to download, process, and store the shows; and then make those episodes available on servers in Canada to ISIA subscribers for streaming and downloading.  *Id.*  In short, the defendant used his expertise in computer programming and coding to amass a huge inventory of infringing television episodes and movies and then provide those to thousands of paid subscribers, repeating the profits.  One partial list of ISIA subscribers for a 27-month period from September 4, 2014, through December 5, 2016, shows 18,551 successful credit and debit card transactions by subscribers, which equates to ISIA receiving on average 22 subscription fee payments every day.  *Id.* at ¶ 2.

The defendant created and ran ISIA himself, with assistance from computer programmers he hired through an online marketplace. However, he was entirely responsible for its operations and kept all of the money he made. Moreover, the defendant also ran other piracy services and associated internet domains. For example, starting at least in 2012, he operated SmackDownOnYou ("SDOY"), BoxBusters.TV, Jailbreakingtheipad, and MixtapeUG. *Id.* at ¶ 12-14. SDOY was a Usenet NZB indexer service that enabled users, for a fee, to search for and download movies, television shows, and other files without permission from copyright owners. The defendant also used SDOY to source infringing works for ISIA. The defendant even ran a site called MixtapeUG, which was focused on music piracy. That site (and related smartphone app) facilitated the streaming and downloading of music via the internet, including copyrighted songs that were otherwise available through legitimate commercial distribution sources. All these operations, especially ISIA, were quite profitable; the defendant admitted to earning over $1 million from his piracy operations. For example, from December 1, 2016 through August 25, 2019, the defendant processed $1,158,717.71 through just one of the many payment gateway and processors he used. Almost all of that money was from ISIA. *Id.* at ¶ 14.

Before starting ISIA, the defendant worked at Jetflicks during two different periods using his computer programming and coding skills to build another massive piracy operation there but one focusing just on television shows. Jetflicks claimed to have over 183,200 television episodes, even more content than ISIA. Exh. A. From May 2012 to September 2013, the defendant's responsibilities included helping to develop the Jetflicks Android smartphone app, boost the number of Jetflicks subscribers, and improve Jetflicks' ability to collect, process, and make infringing television shows available to subscribers. *Id.* at ¶ 31. Later, from December 2015 to July 2016, the defendant returned to Jetflicks, resuming his duties as a computer programmer. *Id.* at ¶¶ 35-37. Besides coding, he responded to complaints about broken shows, requests for new

shows, billing issues, questions about customer accounts, reports about system problems, and queries about how to use Jetflicks on specific devices.

The defendant also aided Dallmann and other co-conspirators' efforts to hide their illegal activities from copyright owners and avoid enforcement. For example, shortly after Dallmann received a cease-and-desist letter from the Motion Picture Association of America ("MPAA") in November 2012 for copyright infringement, the defendant searched the internet for "mpaa website moles," "fake mpaa user account," "correct letter to dmca [Digital Millennium Copyright Act] response," and "dmca reply," and visited various related sites, including an article entitled "MPAA / RIAA Want U.S. to Help Quash The Pirate Bay." *Id.* at ¶ 29.

The defendant pleaded guilty early in the case before the government had obtained much evidence regarding the full scope of ISIA and the damages he caused. As mentioned, the government estimates that the infringement amount for the defendant for both ISIA and Jetflicks is at least $48 million and likely much higher.

In sum, in scale and ambition, the defendant's crimes were remarkable. The nature and circumstances of those offenses suggests that the defendant merits a sentence at the high end of the Guidelines.

**B.     History And Characteristics Of The Defendant**

The defendant's personal history and characteristics show a person deeply embedded in the piracy scene, who devoted his considerable computer programming skills to creating large operations that automated the collection, processing, and sharing of enormous numbers of infringing works. Polo SOF, at ¶¶ 1-13; PSR, at ¶¶ 26-38. With his computer scripts and software doing the tedious work of assembling a catalog of infringing works every day, he could focus on attracting subscribers and making money.

11

The defendant's criminal history also shows multiple criminal charges beginning at a young age. PSR, at ¶ 91-94. In addition, in 2010, he was sued by Dish Network, Echostar Technologies, and Nagrastar for multiple violations of the Digital Millennium Copyright Act and Communications Act. *Id.* at ¶ 123. Essentially, the companies alleged that the defendant was a satellite pirate who distributed software files that enable consumers to illegally intercept and decrypt pay-television programming without authorization and without paying a subscription fee. The court awarded the plaintiffs a $250,000 judgment against the defendant, but he was undeterred. He simply moved to another area of intellectual property theft that he perhaps thought was less risky.

The government appreciates that the defendant has acknowledged that he used his considerable knowledge of computers for illegal gain and that he now understand how this hurts legitimate industry. *Id.* at ¶ 73. However, it is notable that the defendant continued to operate ISIA even after the FBI descended on his house on November 16, 2017 and seized the electronic devices he used to run his piracy services from Las Vegas. Polo SOF, at ¶ 4. The defendant did not stop running ISIA then, and did not even halt after being indicted in August 2019. In fact, the defendant did not stop until the government seized two domains he used for ISIA in September 2019. *Id.* at ¶ 1. And even then the defendant apparently emailed subscribers that he planned to fight the indictment. *See* https://www.cordcuttersnews.com/istreamitall-it-all-shuts-down-following-federal-grand-jury-indictment/.

In short, the history and characteristics of the defendant demonstrate that he deserves a sentence at the high end of the Guidelines.

    C.    **Seriousness Of The Offense And The Need To Promote Respect For Law And Deterrence**

The Court should send a message that piracy is theft, and impose a sentence consistent with the scope of the two massive illegal operations that the defendant helped build and run and the

damage they caused.  While the defendant enjoyed the profits he earned from piracy, at the time he was apparently oblivious to the impact of his crimes on copyright owners and licensees.  He robbed creators of hard-earned compensation, and made it harder for producers to recoup the large investments that go into the production of new movies and television shows.  The defendant even offered movies that had not yet been made available for sale to the general public in the U.S. for authorized download or on DVD or Blu-Ray.  Such pre-release piracy is particularly harmful to a movie's success.  *See, e.g.*, https://www.cmu.edu/entertainment-analytics/documents/impact-of-piracy-on-sales-and-creativity/an%20-empirical-analysis-of-the-impact.pdf (finding that pre-release piracy causes significantly larger losses to box-office revenue than post-release piracy).

A recent report from the U.S. Chamber of Commerce on digital video piracy shows just how harmful the actions of the defendant and others involved with intellectual property theft are.  This report found that online piracy costs the U.S. economy from $29.2 billion to $71 billion a year, with pirated videos viewed over 200 billion times.  *See* https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf, at ii.  The report also found that streaming piracy has now surpassed download-based piracy as the primary vehicle for infringing videos, with 80 percent of piracy now attributable to streaming.  *Id.* at 1.  According to the study, pirated versions of U.S.-produced television shows were viewed over 126 billion times every year and U.S.-produced movies 26.6 billion times.  *Id*. at 5.  Moreover, the report found that the U.S. television and movie industries lose billions of dollars each year from piracy, and that online piracy costs 230,000 to 560,000 American jobs each year.  *Id.* at 14.

Given the scale and duration of the defendant's work with both ISIA and Jetflicks, he was responsible for a not insignificant percentage of these losses and costs, and he should be held accountable.  The defendant's crimes were serious, and the Court should be clear about the need to

promote respect for the law and to deter others who might similarly see internet piracy as an easy way to make money. The Court should sentence the defendant to 57 months.

### III.     Restitution

The government requests that the Court delay a determination on the matter of restitution in this case until after the trial of the remaining six co-defendants for two reasons.

First, based on the outcome of the trial, the Court may decide to hold the defendants jointly and severally liable for the full restitution amount or otherwise apportion liability among the defendants to reflect each defendant's contribution to the victim's loss or the defendant's economic circumstances. *See* 18 U.S.C. § 3664(h); s*ee also, e.g.*, *United States v. Williams*, 319 F.Supp.3d 812, 817-18 (E.D.Va. 2018) (Ellis, J) (holding that because all the defendants contributed to the victim's losses, the Court could make each defendant jointly and severally liable for the full restitution amount). Making a restitution determination regarding the defendant at this time may be premature.

Second, MPAA—and possibly individual right holders victimized by the defendant—will want to provide information to the Court regarding their losses, which could include not only lost income but also costs incurred participating in the investigation and prosecution. *See id.* at § 3663A(b)(4); Exh. B. As such, delaying a determination regarding restitution in this matter would conserve the time and resources of the Court, the Probation Office, victims and their representatives, defendants, defense counsel, and government counsel.

### IV.     Forfeiture

At sentencing, the Government will ask the Court to enter the consent order of forfeiture that will be provided to the Court.

14

## **CONCLUSION**

For the reasons stated above, the United States respectfully requests that the Court impose a sentence of 57 months.

Respectfully submitted,

Date: April 30, 2021

Raj Parekh
Acting United States Attorney

_____/s/_____
Matthew A. Lamberti
Special Assistant United States Attorney,
  Eastern District of Virginia
Senior Counsel,
  Computer Crime and Intellectual Property Section
United States Department of Justice
1301 New York Avenue, NW, Suite 600
Washington, DC 20530
Phone: (202) 514-1026
Email: Matthew.Lamberti@usdoj.gov

_____/s/_____
Alexander P. Berrang
Monika Moore
William E. Fitzpatrick
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Alexander.P.Berrang@usdoj.gov
Email: Monika.Moore4@usdoj.gov
Email: William.Fitzpatrick@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) of the foregoing to the attorneys for the defendants.

I have also sent a copy via email to:

    Karen M. Riffle
    United States Probation Officer
    Karen_Riffle@vaep.uscourts.gov


By:           /s/
    Matthew A. Lamberti
    Special Assistant United States Attorney,
     Eastern District of Virginia
    Senior Counsel,
     Computer Crime and Intellectual Property
    Section United States Department of Justice
    1301 New York Avenue, NW, Suite 600 Washington, DC 20530
    Phone: (202) 514-1026
    Email: Matthew.Lamberti@usdoj.gov