UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Case No. 1:19-CR-253 |
| | ) | |
| | ) | Hon. T.S. Ellis, III |
| **v.** | ) | Sentencing Hearing: May 7, 2021 |
| | ) | |
| **DARRYL JULIUS POLO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**POSITION ON SENTENCING**

Darryl Julius Polo, by counsel, hereby submits the following Position on Sentencing. Mr. Polo comes before the Court having accepted responsibility for, *inter alia*, Conspiracy to Commit Criminal Copyright Infringement. The United States Probation Office ("Probation") has assessed the guideline range to be 63 to 78 months. As explained below, the parties' plea agreement in this case contemplates a guideline range of 41 to 51 months. While Mr. Polo acknowledges that his conduct was serious and deserving of punishment, he respectfully submits that the Pre-Sentence Report's ("PSR") guideline range overstates the seriousness of his offense conduct and understates the mitigating circumstances present here, ████████████████████████████████

████████████████████████████████████████████████████████.

For the reasons that follow, Mr. Polo respectfully submits that the Court should use the guideline range contemplated in the parties' plea agreement as a starting point. He further submits that a sentence of no more than 36 is a just punishment for his conduct and would avoid unwarranted sentencing disparity with other copyright infringement cases resolved in this Division and across the country. In short, a sentence of 36 months is sufficient but not greater than necessary to achieve the goals of sentencing.

1

## Background

Mr. Polo was arraigned on 11 counts of a 19-count Indictment on September 27, 2019. The charges stem from his illegal operation of a subscription-based service that allowed users to stream and download copyrighted movies and shows, and his work at "Jetflicks," another such subscription-based service managed by defendant Dallman. Three months after the arraignment, Mr. Polo, who lives in Las Vegas, flew back to Virginia and entered a guilty plea to Counts 1, 6, 8, 11, and 16.

In Mr. Polo's plea agreement, the parties stipulated to the following guideline provisions:

- Counts One, Six, Eight, Eleven, and Sixteen involve substantially the same harm because their offense levels are determined largely on the basis of the total amount of harm or loss, and therefore shall be grouped together into a single Group pursuant to section 3D1.2(d);

- Pursuant to § 3D1.3(b), **the defendant's offense level is to be determined using the criminal infringement of copyright guideline (i.e., section 2B5.3**) because it produces a higher offense level than the laundering of monetary instruments guideline (i.e., section 2S1.1)

- The defendant's base offense level is 8 pursuant to section 2B5.3(a);

- The infringement amount is more than $250,000, but not greater than $550,000, thus resulting in a 12-level increase pursuant to sections 2B5.3(b)(1) and 2B1.1(b)(1)(G);

- The offense involved the display, performance, publication, reproduction, or distribution of a work being prepared for commercial distribution, resulting in a 2-level increase pursuant to sections 2B5.3(b)(2); and

- The offense involved the manufacture, importation, or uploading of infringing items, resulting in a 2-level increase pursuant to sections 2B5.3(b)(3).

As contemplated in the plea agreement, after adjustment for acceptance of responsibility, the resulting offense level is **21,** and the guideline range **41-51 months** because Mr. Polo is in criminal history category II.

The PSR found that the offense level should be determined under section 2S1.1 rather than the copyright infringement guideline, 2B5.3. The PSR assesses two additional two-level enhancements—one under U.S.S.G. § 2S1.1(b)(2)(B) because Mr. Polo was convicted under 18 U.S.C. § 1956, and the other for use of special skill pursuant to U.S.S.G. § 3B1.3. The defense agrees with the government that the Court should calculate the offense level based on section 2B5.3 consistent with the parties plea agreement. *See* Gov't. Sent. Memo, p. 5 Doc. No. 476. If the Court applies section 2B5.3, a two-level enhancement because the defendant was convicted under 18 U.S.C. §1956 would not apply. *See* Gov't. Sentencing Memo, p. 6. As such, Mr. Polo agrees with the government that the Court should not apply this enhancement. As set forth below, the defense objects to the application of § 3B1.3.

Moreover, the defense respectfully submits that the offense level and resulting guideline range (41-51 months) contemplated in the plea agreement should be the starting point for the Court's analysis. This would allow Mr. Polo to benefit from his early and earnest acceptance of responsibility while also taking into account his specific offense conduct.



███████████. His sentencing hearing was continued several times due to the COVID-19 pandemic.

Mr. Polo has been under conditions of pre-trial supervision since his arraignment in September 2019 and has not incurred a single violation. PSR ¶¶ 6-8. Given his perfect compliance over the last year and a half, Mr. Polo will request that he be permitted to self-surrender to his sentence.[1]

### I. Objection to the PSR

Mr. Polo objects to the two-level enhancement for Use of a Special Skill pursuant to U.S.S.G. § 3B1.3. PSR ¶ 83. First, as the government points out, the PSR uses the money laundering guideline—section 2S1.1—to determine offense level. Mr. Polo did not use a special skill to launder money. *See* Gov't. Sentencing Memo, p. 6, Doc. No. 6. Thus, under the offense guideline used by the PSR, the enhancement is incorrectly applied.

But even if the offense level is found under the copyright guideline, the special skill enhancement cannot apply because the guideline itself prohibits its application where the special skill is accounted for in the base offense level or specific offense characteristic: "This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. Here, Mr. Polo's use of his computer skills is already captured by the specific offense characteristic enhancement applied under section 2B5.3, which applies a 2-level increase because the "offense involved the manufacture, importation, or uploading of infringing items." U.S.S.G. § 2B5.3(b)(3)(A).

---

[1] ███████████████████████████████████████████████████████████████████████

4

The limitation in section 3B1.3 is designed to avoid punishing people twice for harm that is inherent in the offense. For example, in *United States v. Young,* the D.C. Circuit refused to apply the special skill enhancement to a man who manufactured PCP simply because the manufacture of PCP is inherently a highly complex and dangerous process. 932 F.2d 1510, 1512–13 (D.C. Cir. 1991). In so holding, the court noted that "[e]mploying the same logic, the government could also argue that a § 3B1.3 enhancement is due whenever an offense involves some skill that the general public does not possess: counterfeiting U.S. currency or manufacturing a bomb are two likely examples." Similarly, here, Mr. Polo used a special skill—uploading infringing items—that the general public may not possess, but his use of it is already included in specific offense characteristic section 2B5.3. Therefore, an additional two-level enhancement under section 3B1.3 cannot apply.

In short, section 3B1.3 cannot, by definition, apply to Mr. Polo's case because the skill that allowed Mr. Polo to obtain and ultimately "upload" copyrighted TV and movies form the basis of his Use of Special Skill enhancement as described by the PSR. PSR ¶ 69.

**Sentencing Argument**

**I.    Legal Standard**

Fifteen years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range

5

is reasonable." *Gall*, 552 U.S. at 50. Instead the Court is to impose a sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id*. Moreover, the Court need not find "'extraordinary' circumstances to justify a sentence outside of the Guidelines range." *Id*. at 47. The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines. The Court should exercise its broad discretion in this case and impose a sentence below the Guidelines for the reasons that follow.

    a. **Mr. Polo's History and Characteristics**

The attached letters are the most accurate and comprehensive testament to Mr. Polo's fundamentally good and generous character. Undersigned counsel references a few letters here, but respectfully requests that the Court consider each letter submitted on Mr. Polo's behalf. For example, Mr. Polo's cousin, Ashley Moawad, writes, "I've never known Darryl to be anything but a loving, caring, and helpful person."[2] Another cousin describes him as "a wonderful father and step father, loving son and a great big cousin that I can always count on."[3] A close friend writes, "while I have always been impressed with Darryl's business drive and computing skills, I really got a chance to be impressed by his mind and his caring nature for strangers."[4]

Darryl Polo was born in 1983 in Detroit, Michigan. At first blush, Darryl had a typical lower-middle childhood, but beneath the surface his childhood was turbulent and unstable. Throughout Darryl's childhood, his father was addicted to crack cocaine. His father's crack addiction exacerbated the family's financial instability and defined Darryl's youth: his most vivid memories include his father coming home high and breaking objects around the house. Darryl's

---

[2] Letter of Ashley Moawad, attached hereto as part of Exh 1.
[3] Letter of Irene Slepsky.
[4] Letter of Christopher Gelstein.

father is presently 20 years sober and Darryl enjoys a close relationship with both of his parents, though he will be the first to admit that he has not fully recovered from the emotional trauma his father inflicted on the family during the years he struggled with his crack addiction.

At a young age and often unsupervised, Darryl began running around with a fast crowd. He got into trouble and dropped out of high school. ███████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█

When Darryl was 20 years old, he married his high school sweetheart, Kristen Bowren. As Ms. Bowren herself acknowledges, they were married "too young."[5] The pair were on again and off again for years. In 2010, Mr. Polo visited Ms. Bowren and discovered Ms. Bowren in a compromising position with another man. Upon seeing his wife with the other man, he lost his temper and assaulted the man. He was charged and pleaded guilty to home invasion. After the incident, Mr. Polo decided to start over: he packed up his belongings and moved to Las Vegas, where a friend had told him he could find work in computer programming. In doing so, Mr. Polo was not attempting to evade law enforcement. He will return to Michigan following his sentencing to turn himself in on warrants that stemmed from his incident with Ms. Bowren.

It is important to highlight Ms. Bowren's letter to the Court here. Ms. Bowren explains that the two married very young and "started to have marital problems due to being young and not

---

[5] Letter of Kristen Bowren.

understanding how to resolve them like mature adults."[6] She adds that they have put their differences aside and are now "great co-parents."[7] Ms. Bowren adds to the chorus of other friends and family when she writes, "I watched Darryl grow up over the years, he became a great person and father!"[8] So while the incident between Mr. Polo and Ms. Bowren has had rippling consequences on Mr. Polo's life and appears to be very serious on paper, in reality the two have mended fences and recovered from the incident to such an extent that they are able to successfully co-parent their children.

    b.  **Nature and Circumstances of the Offense**

Mr. Polo moved to Las Vegas in 2008, with the hopes of turning over a new leaf. He had long been talented in computers and a friend told him that there were good tech jobs to be found in Las Vegas. Indeed, Mr. Polo was quickly hired to be a computer programmer at Atwoodz, a website design and e-commerce marketing company. . At the same time, Mr. Polo operated his own streaming service called "ISIA."

As Mr. Polo explains to the Court, he knew what he was doing was illegal, but he rationalized it by telling himself that he was not harming anyone. He has since been completely disabused of this fallacy and explains: "I have learned about the impact my crime has on the whole

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

industry and I understand why the prosecution takes it seriously. To say this has been a wake-up call is an understatement."[9] Mr. Polo has expressed his remorse to his family and friends. For example, one friend writes, "he's owned his mistakes and he has no intention of repeating them."[10] Another relative writes, "I understand Darryl Polo has charges against him for violating criminal copyright laws and money laundering. After spending sometime [sic] with Darryl Polo and discussing this situation, I can say he is deeply disappointed in himself and his actions. Your Honor, Darryl Polo has been upset and distressed about the mistakes he's made."[11]

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. As soon as he learned of the arrest warrant pending in this district, he appeared before the Court for an initial appearance. Doc. No. 37. Just a few months later, he pleaded guilty to a multi-count information. Doc. No. 131. Due to circumstances out of his control, his sentencing was continued for over a year; during this period, he has never violated a single condition of his release.

    c. **The Guideline Range**

As stated above, undersigned counsel respectfully requests that the Court use the sentencing guideline range—41-51 months—contemplated by the plea agreement as a starting point in Mr. Polo's case.[12] The plea agreement stipulated that the infringement amount is more

---

[9] Letter of Darryl Polo.
[10] Letter of Nelson Haskett.
[11] Letter of Kaitlin Godla.
[12] The government claims an infringement value of $49 million—a figure that is wildly speculative. Certainly, this number does not reflect actual pecuniary loss caused by Mr. Polo because consumers of "streamed" shows and movies do not typically purchase each individual show. Instead, consumers purchase a subscription—often to multiple services—which allows them to view streaming content at any time. The government's calculation is also undermined by the parties' plea agreement, in which the parties stipulated that the infringement amount was not greater than $550,000.

than $250,000, but not greater than $550,000, thus resulting in a 12-level increase pursuant to sections 2B5.3(b)(1) and 2B1.1(b)(1)(G)and stipulated to other enhancements, which Mr. Polo does not dispute. Taking all other circumstances into consideration, counsel submits that a sentence below this range—36 months—is the appropriate sentence in this case.

### d. The need to avoid unwarranted sentencing disparities.

A survey of copyright infringement cases in both this district and nationwide show that district judges tend to vary downward in copyright infringement cases, even in cases where the "infringement value" is substantial.[13] While of course no two cases or defendants are identical, two cases prosecuted in this Division—"NinjaVideo" and "Megaupload"—are similar to this case in that the defendants owned and operated websites which made infringed material available to customers. In 2011, a number of defendants were convicted of, *inter alia*, copyright infringement for operating "NinjaVideo," a website which offered visitors infringed movies and television shows to view or download for a "donation." The defendants earned additional income from paid advertisements. The lead NinjaVideo defendant and co-founder of NinjaVideo, Beshara, not only founded the website but recruited co-conspirators. Beshara set the lineups of pirated television show and movies available for viewing on NinjaVideo.net.[14] Unlike Mr. Polo, Beshara was openly defiant in her refusal to cooperate and requested that the following language be added to her statement of facts: "The Defendant will not cooperate with the investigation of any co-defendant or unindicted individuals involved in NinjaVideo."[15] Though she was the most culpable defendant, Beshara was sentenced to 22 months—a sentence well below the 46 to 57 month

---

[13] See Exhibit 3, charting examples of copyright infringement cases and in other districts.
[14] Position of the United States with Respect to Sentencing, *United States v. Beshara*, No. 11-cr-447-001 (E.D. Va. Dec. 30, 2011) ECF No. 91.
[15] *Id*. at 3, ECF No. 91.

guideline range. The second lead NinjaVideo defendant Smith, who designed the website and made agreements with advertisers, also received a downward variance and was sentenced to 14 months imprisonment.[16]

The instant case is also similar—albeit smaller in scope—to the "Megaupload Conspiracy," which is still pending in this Division but for one defendant who has been sentenced for his role in the conspiracy. The Megaupload conspirators are charged with operating a streaming service similar to Jetflicks and ISIA. According to the Megaupload Indictment, the defendants "engaged in a criminal copyright infringement and money laundering on a massive scale with estimated harm to copyright holders well in excess of $500,000,000 and reported income of in excess of $175,000,000."[17] The Indictment further charges the defendants with operating a commercial website [Megaupload] and service . . . that reproduces and distributes copies of popular copyrighted content over the Internet without authorization."[18] The Megaupload conspiracy is vast in scope: it existed for over five years and "Megaupload.com was at one point in its history to be the 13th most frequently visited website on the entire Internet."[19] Megaupload's income derived from premium subscriptions and online advertising. According to the Indictment, the Megaupload conspirators directly paid millions of dollars to uploaders through online payments. The Conspiracy "directed the bulk of its revenues to the defendants, corporate entities they control, other co-conspirators, and employees for their financial gain."[20] While the most culpable members of the Megaupload conspiracy are abroad and their cases are pending, one defendant, Andrus

---

[16] Sentencing, *United States v. Beshara*, No. 11-cr-447-001 (E.D. Va. Jan. 6, 2012) ECF No. 96, 116; .
[17] Indictment ¶ 1, *United States v. Nomm*, No. 12-cr-00003-LO-8, (E.D. Va. Jan. 5, 2012) ECF No. 1.
[18] *Id*. ¶ 2, ECF No. 1.
[19] *Id*. ¶ 3, ECF No. 1.
[20] *Id*. ¶ 5, ECF No. 1..

Nomm, was extradited to this District from New Zealand and pleaded guilty to conspiracy to commit copyright infringement. Nomm admitted that he and the co-conspirators were aware that users of the Megaupload websites stored infringed content.[21] Presumably because Nomm was considered to be minimally culpable, Nomm pleaded guilty pursuant to Rule 11(c)(1)(C) of the Federal Rule of Criminal Procedure wherein the parties agreed that Nomm would be sentenced to 12 months and one day.[22] The Court accepted the plea and imposed the agreed-upon sentence.

Mr. Polo does not argue that he is exactly similarly situated to the NinjaVideo defendants or to defendant Nomm. Indeed, he is not requesting a sentence close to the sentences the NinjaVideo defendants—even the lead defendants—received. That said, these two cases illustrate that district judges have imposed below-guidelines sentences in copyright infringement cases involving the distribution of infringing material through sites similar to that of Jetflicks and ISIA. As such, a sentence below Mr. Polo's guideline range would avoid unwarranted sentencing disparities.

      e. **Thirty-Six months is a just punishment and an adequate deterrent.**

A sentence of 36 months would be the longest sentence Mr. Polo will have served. This extended period of time away from his family, friends, and community would send a clear signal that copyright infringement and money laundering are serious offenses punishable with prison. A 36-month sentence would be a more than adequate deterrent; while Mr. Polo is committed to leading a lawful life after his release (and has expressed an interest in using his skills to combat

---

[21] *See* Nomm Statement of Facts, *United States v. Nomm*, No. 12-cr-00003-LO-8, (E.D. Va. Feb. 13, 2015) ECF No. 204.
[22] *See* Nomm Plea Agreement, 2-3, *United States v. Nomm*, No. 12-cr-00003-LO-8, (E.D. Va. Feb. 13, 2015) ECF No. 203.

copyright infringement online[23]), this case and his sentence would also be a warning sign to others who may not necessarily be aware that copyright infringement can carry significant prison sentences.

Moreover, with respect to deterrence, research has shown that shorter prison sentences are just as effective as longer prison sentences – perhaps even more so.[24] The Department of Justice agrees: "Increasing the severity of punishment does little to deter crime." *See* Nat'l Institute of Justice, *Five Things About Deterrence*, available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence. The Sentencing Commission recently reaffirmed this point in a study of the recidivism rates of offenders with lengthy prison sentences that found no statistically significant difference in the recidivism rates of those who were released early under the drugs minus two amendment and those who were not.[25]

In sum, a sentence of 36 months is no greater than necessary to achieve the goals of sentencing. Mr. Polo knows that he will be separated from his family and unable to meaningfully co-parent his children. ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ And considering the fact that other similarly situated defendants in this district received downward

---

[23] Letter of Darryl Polo.
[24] Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1 (2006), *available at* https://scholarship.law.umn.edu/faculty_articles/495. "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*. at 28-29.
[25] U.S. Sentencing Comm'n, Retroactivity & Recidivism: *The Drugs Minus Two Amendment* (July 8, 2020), available at https://www.ussc.gov/research/research-reports/retroactivity-recidivism-drugs-minus-two-amendment).

variances for similar conduct, a 36-month sentence is clearly the appropriate and just punishment for Mr. Polo.

Respectfully submitted,

Darryl Polo

By Counsel

\_\_\_/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2021, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

\_\_\_/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
Assistant Federal Public Defend